JAMES H. TORRENS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDWIN WILE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53778, 54451. Promulgated November 30, 1934.

*Wilbur H. Friedman, Esq.,* for the petitioners.
*L. W. Creason, Esq.,* for the respondent.

792

## OPINION.

LEECH: Respondent relies generally upon two positions. The first is that when these petitioners are said to have created trusts in common stock of the D. Emil Klein Co., they had no interest therein subject to disposition. The second and alternative position is that, assuming petitioners then had such an interest, the evidence does not establish the creation of a valid trust.

In the case of petitioner Torrens, it is argued that because of the conditions under which the 500 shares of common stock were issued to him in 1922, he could have no ownership of this stock until its delivery to him from escrow, and that, consequently, the amounts paid him as dividends on this stock were in fact additional compensation for services rendered. The conclusion reached, then, is that, having no title to or interest in this stock, subject to disposition, Torrens could not create a trust in the stock itself and his attempt to do so, if it had any effect, was merely an assignment of future earnings, and taxable to the assignor, as income. *Lucas* v. *Earl*, 281 U. S. 111.

This same theory is applied and the same result reached as to the petitioner, Wile, and the dividends received on the stock standing in his name were taxed to him. However, as to this petitioner, respondent determined also that the proceeds of the sale, in 1928, of 400 shares of the total of 1,000 shares issued to him, represented taxable income in that year. It is not clear whether this is upon the theory that the escrow agreement was then released as to this stock, and the stock received as income at a value corresponding to its sale price, or whether it is considered that the payment made by the corporation was for stock not owned by the petitioner, and merely additional compensation paid him as if for property conveyed. Upon brief, counsel for respondent now concedes that the total proceeds from the

sale of this stock should be reduced by an amount equal to $9.95 per share, as the proof shows this petitioner purchased the stock for cash on that basis.

The issuance, and its record upon the books of the company, together with the escrow agreement, all purport on their face to confirm an intended conveyance of this stock to petitioners. Nor is that intention contradicted by an analysis of the contents of those instruments, construed as a whole. Cf. *Heryford* v. *Davis*, 102 U. S. 225. Petitioners acquired more than future earnings of the corporation. They had the right, inherent alone in stockholders, to a share, not only in earnings, but in any increment in the net assets of the corporation. We think the elimination of good will from the price at which the corporation conditionally agreed to repurchase has no effect other than a proper limitation of the repurchase price of the stock. But in any event it could have done no more than diminish by that item—not destroy—petitioners' rights as stockholders. It is doubtful whether the irrevocable assignment of the voting rights in the stock to Klein was valid and enforceable. *Woodruff* v. *Dubuque & S. C. R. Co.*, 30 Fed. 91; *Shepaug Voting Trust Cases*, 60 Conn. 553; 24 Atl. 32; *Luther* v. *Ream*, 270 Ill. 170; 110 N. E. 373; *Warren* v. *Pim*, 66 N. J. Eq. 353; 59 Atl. 773; contra, *Boyer* v. *Nesbitt*, 277 Pa. 398; 76 Atl. 103. And, if invalid, the title of petitioners to the stock would in no way be affected thereby. The voting rights would merely be subject to recovery in a proper action, *Warren* v. *Pim*, *supra*. If such assignment were valid it accomplished nothing more than a further limitation in petitioners' rights in the stock incident to stock ownership. Cf. *Boyer* v. *Nesbitt*, *supra*.

The restriction against alienation, if enforceable as not in restraint of trade (*In re Laun*, 146 Wis. 252; 131 N. W. 366; contra, *New England Trust Co.* v. *Abbott*, 162 Mass. 148; 38 N. E. 432), did not affect petitioners' ownership in the stock.

The presence in an agreement of sale of stock providing for its repurchase by the seller upon condition does not in itself destroy the then completed sale to the purchaser, nor does such an agreement alone revest any title in the original seller. It is merely an unexecuted option to rescind the original completed sale. *Lyons* v. *Snider*, 136 Minn. 252; 161 N. W. 532; *Paulson* v. *Weeks*, 80 Ore. 468; 157 Pac. 590.

The fact that in both cases the stock was deposited in escrow under an agreement by the seller to repurchase at its then book value less good will is an affirmative indication that title to the stock was intended to pass by the purported transfer. Cf. *First National Bank in Wichita* v. *Commissioner*, 57 Fed. (2d) 7, affirm-

ing 19 B. T. A. 744; *Bank of California, National Association*, 30 B. T. A. 556.

Respondent cites authority to the effect that where stock is deposited in escrow pending the performance of certain conditions by the purchaser, title does not pass to him until the performance of the conditions. He argues upon authority of these decisions that title to the stock in each present instance would not pass to these petitioners until the discharge of the escrow agreement.

We agree with the rule cited by respondent, but clearly it has no application to the petitioners. The conditions incident to the acquisition of title by them had been fully performed and the stock issued. The decisions cited, as well as *Lyons* v. *Snider*, *supra*, and *Paulson* v. *Weeks*, *supra*, indicate only that title would remain in these petitioners until the reacquisition of title by the corporation was effected by the performance of the conditions specified in the escrow agreement—namely, the repurchase of the stock by the corporation and the payment to petitioners of its then book value, fixed as the consideration.

In our judgment, petitioners acquired legal title to the Klein stock. Its uniform treatment as such by all the parties after its acquisition is uncontradicted and confirms that conclusion. *First National Bank in Wichita* v. *Commissioner*, *supra*, and *Bank of California, National Association*, *supra*.

Petitioners' acquisitions of stock were complete upon payment of the consideration therefor to the corporation. Petitioner Wile bought his stock for cash in 1925 for $9.95 per share. Torrens acquired his for services rendered the corporation during 1922. At the close of business on the last day of that year, those services had been rendered, and the consideration was thus paid. His stock was then acquired. *Hudson Motor Car Co.* v. *United States*, 3 Fed. Supp. 834; *Phillip W. Haberman*, 31 B. T. A. 75. Its cost basis for computation of gain or loss on later disposition was its fair market value upon that date, which we have found to be $7.59 per share. *E. D. Knight*, 28 B. T. A. 188.

Any question as to whether the conditions of the escrow agreement precluded a transfer in trust by these petitioners of their interests in this stock is answered emphatically by the record. It is true that by the escrow agreement the petitioners bound themselves not to transfer the stock or any interest therein, but this condition was for the benefit of the corporation, subject to enforcement by it alone, and, consequently, within its power at any time to release. The record shows that authority was formally given by the corporation to D. Emil Klein, who was its president and also the escrow agent under the agreements executed, to release or modify these agreements, in his

discretion. It is likewise shown that Klein, when approached by the petitioners, gave his permission and approval for the transfer in trust of the beneficial ownership of each petitioner in certain amounts of the stock theretofore issued to him. It may be doubtful if modification of the agreements was necessary, but if it were, such modification was effected by the express acquiescence of Klein. The corporation, alone, was entitled to question the transfers under the escrow agreements. It was thus estopped from doing so.

This brings us to respondent's second and alternative position. Did each of these petitioners, in fact, create a valid and enforceable trust in a portion of their respective stock interests? The law does not require any particular form to be followed in declaring a trust in personal property or that such declaration even be in writing. It is essential, only, that the declaration be shown by words or acts to have been made in fact. *Estate of Robert L. Holt*, 14 B. T. A. 564.

In the present case the facts are not in dispute. The inquiry is simply whether these facts are sufficient to establish that a trust was declared by each of these petitioners. On this question the record shows that both of the petitioners discussed with D. Emil Klein their intention to create a trust of a definite portion of their stockholdings. They received his consent and approval as escrow agent and president of the corporation, to such action. Following this, each notified Klein formally in writing that such trust was declared, was irrevocable, described the property covered and set out the beneficiaries in each case by name. In each instance this notification called upon Klein, who held possession of the stock certificates, to make such notations as might be necessary to witness the fact that certain shares of the stock in his possession were henceforward held by each petitioner in trust. It is further shown that the stock certificates were not reissued to petitioners as trustees, only because of Klein's refusal to take such action. He held possession of the stock. However, a mere failure to secure transfer of the stock certificate, which is only the evidence of stock ownership, would not prevent or delay the transfer of the interest itself. *Holden* v. *Williams*, 65 Ill. App. 466; *Allen* v. *Williams*, 212 Ill. App. 114.

The record indicates that the petitioner, Torrens, advised his four sons of the action taken. Three of these sons were of age and the fourth, 20 years old. They all approved of this petitioner's action and agreed to his disbursement of the income from the stock for their education and maintenance and for investments for their accounts. Petitioner Wile's children were small. The income from the dividends on and proceeds from the sale of stock designated by him as held in trust, were, admittedly, deposited by him to his own account without segregation, but he maintained a memorandum of such

amounts as were due the beneficiaries and used such funds for their maintenance and support and for investment for their benefit. The regular dividends on the stock asserted to be held in trust for his wife, he paid to her. The other income accruing to her alleged share of the trust was invested in stocks issued in her name. Thus, shortly after 1928, this petitioner purchased approximately $19,000 worth of stock which was issued to his wife. The stock which he bought for the account of his children was issued in his name. This is not unusual or inconsistent with the existence of the alleged trust when we consider that the children were of tender age. At all events, the taxable status of these funds is not affected by the disposition petitioners made of them. *Mary M. Shea*, 31 B. T. A. 513. We note also that late in the taxable year when the corporation proposed to increase its common stock to 100,000 shares and issue the new stock to its outstanding stockholders on the basis of seven new shares for one of the old, both of these petitioners formally requested, by letter to Klein, that the new stock exchanged for that portion of their old stock which was being held by them in trust, be issued in the names of the several beneficiaries. Klein refused because of the escrow agreement, but stated that it would be issued in his name, as trustee, to protect all parties to the agreement. He added that he would note the interest of the beneficiaries on the new stock certificates and distribute the stock in accordance with such interests on the expiration of the escrow agreement. Obviously Klein meant the new stock would be issued, as the old, to petitioners, and held by him under the escrow agreement. This was actually done, and when the escrow agreement expired in 1931, the stock was reissued in each case as requested theretofore by the petitioner.

From the date of the purported transfers in trust, the several beneficiaries under each trust filed individual income tax returns each year reporting the income on their several shares under the trusts.

In fact, the record here shows that petitioners did all that could reasonably be done to evidence such trusts except execute formal declarations. Neither petitioner was a lawyer but both, when later advised by their attorney that such declaration should be executed, to avoid any question, had formal declarations drawn and executed them, evidencing the creation of the trust in each case as of the date of its creation according to the notification theretofore sent in each instance to the escrow agent and president of the corporation.

We conclude that petitioner Wile created a trust in 750 of his 1,000 shares of common stock, and 45 of his 60 shares of preferred stock of the corporation, in favor of his wife and two sons in equal

shares and, consequently, that three fourths of the dividends paid and the profit upon the sale of 400 shares of common stock in 1928, is taxable to these three beneficiaries. *J. T. Hedrick*, 24 B. T. A. 444; *John Knell*, 12 B. T. A. 1306; *Tom (Fayette T.) Moore*, 19 B. T. A. 140. Such profit is to be computed on a cost basis of $9.95 per share.

In reference to the sale for $6,000 of 60 shares of preferred stock issued to Wile, 45 of these shares were the property of the trust above described and the proceeds of these shares constituted no gain to this petitioner. As to the balance of 15 shares, the record shows this stock was received by petitioner as stock dividends in years prior to 1928 on common stock owned by him. The corporation then had other preferred stock outstanding. The preferred shares, received as dividends, had rights and privileges distinctly different from those of the common stock. In *Tillotson Manufacturing Co.*, 27 B. T. A. 913, under substantially similar circumstances, a dividend on preferred stock payable in common stock was held not a tax free stock dividend, since it was more than a mere dilution of the stockholders' then interest. If there be any difference in the degree of change effected in the stockholders' existing rights by the converse factual situation here, we do not think it sufficient to except this case from the application of that rule. This preferred stock is shown to have had a fair market value equal to the par value of $100 per share at all times. Based upon this value, it was taxable income to Wile in the years received. *Tillotson Manufacturing Co., supra.*

The record is silent as to whether any value for this stock was included in those years. In the absence of such showing, we cannot assume that it was not. In fact, the presumption arising under such conditions may be that it was included. *United States Bank* v. *Dandridge*, 25 U. S. 64.

In any event, the value of this stock, since it was income for prior years, is includable in income for 1928 only in the event that the petitioner, for some reason, is estopped to assert its taxability for the prior year in which received. If such estoppel exists, the burden is upon respondent to establish it. *Tide Water Oil Co.*, 29 B. T. A. 1208. The petitioner is not required to prove both a defense and the absence of an estoppel to assert it. *Farmers Feed Co.*, 10 B. T. A. 1069.

In respect of the petitioner, Torrens, we hold that four fifths of the 500 shares of common stock of the corporation standing in his name, was, during the taxable year, held in trust by him for his four sons, and the dividends received on such portion in that year were taxable to the beneficiaries and not to petitioner. As to the 100 shares of preferred stock issued to this petitioner in prior years as

dividends on his common stock, the record clearly shows that the stock was transferred by him by gift to his sons in equal proportions early in the taxable year, and was reissued to them individually in blocks of 25 shares. The dividends paid on this stock were thereafter paid to the sons. Late in the taxable year this stock was sold by the sons at par and the purchase price paid to and received by them. This petitioner is not taxable upon either the dividends on this stock or the proceeds of the sale thereof.

There is some discussion in the record as to whether the large cash dividend of $78.50 paid on the common stock in the taxable year was a dividend and taxable as such in its entirety, or was a payment in exchange for the outstanding common stock turned in for reissue on a basis of seven for one in the course of the recapitalization of the corporation later in that year. On this point we find nothing in the record to indicate that this was other than a cash dividend on the stock. It was regularly declared by the corporation on the common stock outstanding and was paid prior to the exchange of that stock for the new shares. It represented a distribution to the original stockholders of earnings of the corporation accumulated since March 1, 1913. No part of it represented the cash later paid into the corporation for the 30,000 shares of new common stock sold the public. We hold it was not a payment in exchange for the old shares, but was a cash dividend paid on the stock, and taxable as such. Revenue Act of 1928, sec. 115 (a).

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

McMAHON, dissenting: I dissent from the majority opinion in so far as it holds that the preferred stock received by Wile (Docket No. 54451) as stock dividends in years prior to 1928 on common stock owned by him was taxable income to Wile at its fair market value in the years received, under *Tillotson Manufacturing Co.*, 27 B. T. A. 913.

This proceeding is distinguishable from the *Tillotson* case. In that case the petitioner received *common stock as dividends on preferred stock.* There the holders of preferred stock had the right to 7 percent cumulative dividends payable quarterly out of the surplus profits of the corporation for each year in preference to the holders of common stock, the only other stock outstanding. The common stock received by such holders of preferred stock was in payment of *defaulted cumulative dividends from July 1921 to September 30, 1925,* amounting to $29.75 per share. Some of the preferred shareholders *insisted upon and received the $29.75 of dividends in cash.*

In this proceeding petitioner Wile received *preferred stock of the par value of $100 per share prior to 1928 as dividends upon common stock.* As a holder of common stock he had no rights of preference as to dividends or otherwise, and the corporation issuing the stock was not in default in the payment of dividends on its preferred stock. Wile, in 1928, sold the preferred stock, in question here, to the corporation at $100 per share. He had purchased his common shares at $9.95 per share.

It is elementary that ordinarily the *capital* interest of holders of preferred stock is limited to its par value, and that they have no *capital* interest in the surplus profits; that their interest in the surplus profits is limited to the fixed rate of dividend; that such interest is an *income* interest as distinguished from a *capital* interest; and that even a premium paid to holders of preferred stock upon redemption of such stock is not a *capital* interest, but constitutes *income* and is taxable as such.

It is also elementary that the capital interest of holders of common stock embraces not only the amount invested but also the surplus, after all other liabilities are provided for. Of course, if there is preferred stock outstanding entitled to a preference as to dividends, the surplus profits are subject to the payment of such dividends to preferred stockholders. The amount of such unpaid cumulative dividends, according to good accounting practice, is to be noted upon any statement of corporate assets and liabilities in order to show that surplus does not represent the true capital increase of the common stock, but is subject to the undeclared accrued and unpaid dividends to preferred stockholders. However, if the dividends payable to holders of preferred stock are paid as they accrue out of surplus available for dividends, then all of the remaining surplus profits constitute *capital* interest of holders of common stock only.

Hence, when petitioner Wile received the preferred stock as dividends, the outstanding preferred stock having received the dividend to which it was entitled, he merely received the evidence, in the form of the certificates for preferred shares, of his proportionate share in the surplus to the extent of such dividend. He received nothing in addition to what he theretofore had except such certificates.

The findings of fact of the majority contains the following: " In addition to cash dividends, *desiring to keep earnings in the business,* the corporation in several years *issued dividends on the common stock in preferred stock.*" (Emphasis supplied.) Nothing was taken from the corporation and it merely capitalized a part of its surplus profits on its books of account. Nothing was taken from the holders of preferred stock. Their capital interest to the extent of the par value of their shares was represented by assets of the corporation and they

had no other interest, either capital or income, in the surplus, since they had received all of their dividends to which they were entitled, when the preferred stock was issued as a dividend on common stock.

To illustrate, let us assume the following represents the balance sheet of a corporation prior to the declaration of a preferred stock dividend:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $150,000 | Trade liabilities | $100,000 |
| | | Dividend liabilities: | |
| | | On preferred stock, $1.75 per share in cash | 12,250 |
| | | On common stock, $2.50 per share in cash | 37,500 |
| Other assets | 2,599,750 | Stock liabilities: | |
| | | Authorized capital: | |
| | | 20,000 shares no par common | ---------- |
| | | 10,000 shares preferred, par value $1,000,000 | ---------- |
| | | Stock issued and outstanding: | |
| | | 15,000 shares common | 1,500,000 |
| | | 7,000 shares preferred | 700,000 |
| | | Surplus | 400,000 |
| Total | 2,749,750 | Total | 2,749,750 |

Then suppose such corporation determines to declare a stock dividend to common stockholders to the extent of $15 per share payable in the unissued preferred stock of the corporation. This would require only the transfer of $225,000 (15,000 × $15) from surplus to preferred stock liability, so that the preferred stock liability would be $925,000 with 9,250 shares outstanding instead of $700,000 with 7,000 shares outstanding, and the surplus $175,000 instead of $400,000. As stated in *Eisner* v. *Macomber*, 252 U. S. 189.

\* \* \* This, however, is merely bookkeeping that does not affect the aggregate assets of the corporation or its outstanding liabilities; it affects only the form, not the essence, of the " liability " acknowledged by the corporation to its own shareholders, and this through readjustment of accounts on one side of the balance sheet only, increasing " capital stock " at the expense of " surplus " \* \* \*.

A similar adjustment would have to be made had a dividend been declared payable in common stock on common stock, as was the case in *Eisner* v. *Macomber*, *supra*, instead of a preferred stock dividend on common stock such as we have in the instant proceeding.

In the *Tillotson* case the surplus of the corporation did not represent in its entirety a *capital* accession to the original capital of holders of common stock, when common shares were issued to preferred shareholders. It was then subject to the payment of defaulted dividends on preferred stock to the extent of $29.75 per share and to this extent did not represent *capital* increase of holders of common stock. To this extent it represented the accrued and unpaid dividends on preferred stock. The *capital* interest of holders of preferred stock to the extent of the par value thereof was fully represented by assets

and they had no *capital* interest in the surplus. It follows that since their interest in the surplus profits was an *income* interest as distinguished from a *capital* interest, the common stock given in payment of that income interest constituted *income*. On the other hand, since Wile's interest as a holder of common stock in the surplus profits was a *capital* interest, the preferred stock given to him as dividends represented a *capital* interest and therefore was not taxable. As stated in *Eisner* v. *Macomber, supra,* "enrichment through increase in value of *capital* investment is not *income* in any proper meaning of the term." [Emphasis supplied.]

Furthermore, in the *Tillotson* case, as heretofore pointed out, cash was paid to some of the stockholders and it was paid to them because they insisted upon it. Under the terms of the preferred stock there the holders of the preferred stock were entitled to the payment of their dividends in cash. They could not have been compelled to take anything but cash. There existed an obligation to pay to holders of preferred stock not only dividends, but dividends in cash. There had been repeated default in these payments extending over a period of more than four years. Assuming that the declaration of a dividend is essential to create a debt to the extent of the dividend declared, a dividend of $29.50 was declared, and this declaration of a dividend of $29.50 was nothing but a formal recognition of the corporation's existing obligation under the terms of the preferred stock. Instantaneously with the declaration of the dividend a debt was created to the extent of such dividend. However, the corporation had no cash with which to pay such dividend. Some of the holders of preferred stock were willing to take common stock at a fixed price in payment of the dividend to which they were entitled and accepted common stock in lieu of cash, while other holders of preferred stock insisted upon and received cash. The result was that there was a settlement or composition of an existing obligation of long standing, which, by formal recognition by way of a declaration of dividend, had ripened into a debt. In this view, there was not declared and paid a voluntary true stock dividend. In the instant proceeding the preferred stock dividend is a voluntary true stock dividend and was not declared and paid under the compelling circumstances present in the *Tillotson* case.

The majority opinion states that:

* * * In *Tillotson Manufacturing Co.*, 27 B. T. A. 913, under substantially similar circumstances, a dividend on preferred stock payable in common stock was held not a tax-free stock dividend, since it was more than a mere dilution of the stockholder's then interest. If there be any difference in the degree of change effected in the stockholder's existing rights by the converse factual situation here, we do not think it sufficient to except this case from the application of that rule. * * *

There is no adequate support in the record for the view that in the *Tillotson* case a dividend was declared " under substantially similar circumstances " present in the instant proceeding. The majority opinion recognizes that in the instant proceeding a " *converse factual situation* " is presented as compared to that presented in the *Tillotson* case. As heretofore pointed out, in the instant proceeding preferred stock was issued as a dividend to holders of common stock, whereas in the *Tillotson* case common shares were issued to some of the preferred stockholders and cash paid to others; in the instant proceeding the holders of common stock were not entitled to fixed cumulative dividends; no preferred stock dividends were in default and unpaid; and the dividend declared was a voluntary, true stock dividend. In the *Tillotson* case the holders of preferred stock under the terms of the issuance of their stock were entitled to a fixed cumulative dividend. In order to authorize payment it was necessary to declare such dividend; but it is common knowledge that, when such dividends are permitted to remain unpaid as they accrue, the credit standing of the corporation is affected. The maintenance of good financial standing compels their payment. Furthermore, as heretofore pointed out, the $29.50 represented *income* to the holders of preferred stock in the *Tillotson* case and did not represent a *capital* interest, whereas the preferred stock dividend in the instant proceeding represented the *capital* interest of Wile. These differences between the *Tillotson* case and the instant proceeding are sufficient to distinguish them. What is said in the *Tillotson* case should be read in the light of its peculiar facts and should not be applied to a factual situation such as we have in the instant proceeding, which is so different; and the doctrine of the *Tillotson* case should not be carried a single step beyond the requirements of the peculiar facts of that case.

Assuming without conceding, and only for the purpose of this discussion, that this proceeding is controlled in whole or in part by the result or by the discussion in the *Tillotson* case and that the *Tillotson* case requires the result reached by the majority in this respect in this proceeding, then that case to that extent should be overruled as contrary to applicable provisions of the Federal Constitution, decisions of the courts and of this Board, provisions of the revenue acts and of regulations and rulings of the Secretary of the Treasury and of the Bureau of Internal Revenue, respectively, promulgated thereunder, and the long continued practice of the officials charged with the administration of the revenue acts.

The applicable provisions of the Federal Constitution are as follows.

Article I, section 2, clause 3, thereof is, in part as follows:

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by  *  *  *.

Article I, section 9, clause 4, thereof is as follows:

No capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

The Sixteenth Amendment thereof is as follows:

The Congress shall have power to lay and collect taxes on *incomes*, from whatever source derived, *without apportionment among the several States, and without regard to any census or enumeration.* [Emphasis supplied.]

The United States Supreme Court, in *Eisner* v. *Macomber, supra,* which arose under the Revenue Act of 1916 and was decided March 8, 1920, states the question before it for its consideration to be as follows:

This case presents the question whether, by virtue of the Sixteenth Amendment, Congress has the power to tax as *income* of the stockholder and without apportionment, *a stock dividend made lawfully and in good faith against profits accumulated by the corporation since March 1, 1913.* [Emphasis supplied.]

In its discussion of this question the Court stated:

* * * Far from being a realization of profits of the stockholder, it tends rather to postpone such realization, in that *the fund represented by the new stock has been transferred from surplus to capital, and no longer is available for actual distribution.*

The essential and controlling fact is that *the stockholder has received nothing out of the company's assets for his separate use and benefit;* on the contrary, every dollar of his original investment, *together with whatever accretions and accumulations have resulted from employment of his money and that of the other stockholders in the business of the company, still remains the property of the company, and subject to business risks which may result in wiping out the entire investment.* Having regard to the very truth of the matter, to substance and not to form, *he has received nothing that answers the definition of income* within the meaning of the Sixteenth Amendment. [Emphasis supplied.]

The Court concluded as follows:

Thus, from every point of view we are brought irresistibly to the conclusion that neither under the Sixteenth Amendment nor otherwise has Congress power to tax without apportionment a *true stock dividend made lawfully and in good faith, or the accumulated profits behind it, as income of the stockholder.* The Revenue Act of 1916, in so far as it imposes a tax upon the stockholder because of such dividend, contravenes the provisions of article 1, § 2, cl. 3, and article 1, § 9, cl. 4, of the Constitution, and to this extent is invalid, notwithstanding the Sixteenth Amendment. [Emphasis supplied.]

Section 201 (a) and (c) of the Revenue Act of 1918, substantially the same as section 2 (a) of the 1916 Act, provided as follows:

SEC. 201. (a) That the term "dividend" when used in this title * * * means (1) any distribution made by a corporation, other than a personal service corporation, to its shareholders or members, whether in cash or in other property or *in stock of the corporation, out of its earnings or profits accumulated since February 28, 1913,* * * *.

* * * * * * *

(c) A dividend paid in stock of the corporation shall be considered income to the amount of the earnings or profits distributed. * * * [Emphasis supplied.]

After the decision in *Eisner* v. *Macomber, supra,* was rendered, Congress amended section 201 of the Revenue Act of 1918 by section 201 of the 1921 Act, which reads as follows:

SEC. 201. (a) That the term "dividend" when used in this title * * * means any distribution made by a corporation to its shareholders or members, *whether in cash or in other property, out of its earnings or profits* accumulated since February 28, 1913 * * *.

* * * * * * *

(d) A *stock dividend shall not be subject to tax* but if after the distribution of any such dividend the corporation proceeds to cancel or redeem its stock at such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to the distribution of a taxable dividend, *the amount received in redemption or cancellation of the stock shall be treated as a taxable dividend* to the extent of the earnings or profits accumulated by such corporation after February 28, 1913. [Emphasis supplied.]

Article 1545 of Regulations 45, under the 1918 Act, stated as follows:

A dividend paid in stock of the corporation is income to the amount of the earnings or profits distributed, as shown by the transfer of surplus to capital account on the books of the corporation, usually equal to the par value of the stock distributed. * * *

Article 1547 of the same regulations, pertaining to the sale of stock received as dividend, stated in part as follows:

ART. 1547. *Sale of stock received as dividend.*—As stock dividends were taxable income under the Revenue Act of 1916, as well as the present statute, but were not under the Act of October 3, 1913, different considerations may apply to the sale of stock received as a dividend before 1916 and stock so received thereafter. * * *

It is to be noted that this regulation stated that stock dividends were not taxable income under the Act of October 3, 1913, and this is in conformity with the decision of *Towne* v. *Eisner,* 245 U. S. 418, expressly adhered to in *Eisner* v. *Macomber, supra.* In *Towne* v. *Eisner, supra,* the United States Supreme Court held that stock dividends under that act were not taxable income, stating as follows:

* * * Notwithstanding the thoughtful discussion that the case received below we cannot doubt that *the dividend was capital as well for the purpose of the Income Tax Law as for distribution between tenant for life and remainderman.* * * * *In short, the corporation is no poorer and the stockholder is no richer than they were before.* * * * *No one could call the new certificates income.* What has happened is that the plaintiff's old certificates have been split up in effect and have diminished in value to the extent of the value of the new. [Emphasis supplied.]

As early as *Gibbons* v. *Mahon*, 136 U. S. 549, wherein the question was raised whether a stock dividend represented *income* and as such was the property of the life tenant, or whether it represented *capital* and as such was a part of the corpus to which the remainderman was entitled, the Court said:

In ascertaining the rights of such persons, the intention of the testator, so far as manifested by him, must of course control; but when he has given no special direction upon the question as to what shall be considered principal and what income, he must be presumed to have had in view the lawful power of the corporation over the use and apportionment of its earnings, and to have intended that the determination of that question should depend upon the regular action of the corporation with regard to all its shares.

Therefore, when a distribution of earnings is made by a corporation among its stockholders, the question whether such distribution is an apportionment of additional stock representing capital, or a division of profits and income, depends upon the substance and intent of the action of the corporation, as manifested by its vote or resolution; and *ordinarily a dividend declared in stock is to be deemed capital*, and a dividend in money is to be deemed income, of each share. [Emphasis supplied.]

Following the decision of *Eisner* v. *Macomber*, *supra*, rendered March 8, 1920, certain rules were promulgated in T. D. 3052, 3 C. B. 38 (July–December 1920), containing among others the following:

(1) Where a corporation, being authorized so to do by the laws of the State in which it is incorporated, *transfers a portion of its surplus to capital account, issues new stock representing the amount of the surplus so transferred, and distributes the stock so issued to its stockholders, such stock is not income to the stockholders, and the stockholders incur no liability for income tax by reason of its receipt.* [Emphasis supplied.]

In addition article 1545 of Regulations 45 was revoked by T. D. 3059, 3 C. B. 38 (July–December 1920), together with certain other articles, all pertaining to stock dividends, and article 1547 was amended as follows:

ART. 1547. *Sale of stock received as dividend.*—*Stock received as a dividend does not constitute taxable income to the stockholder, but any profit derived by the stockholder from the sale of such stock is taxable income to him.* For the purpose of ascertaining the gain or loss derived from the sale of such stock, or from the sale of the stock with respect to which it is issued, the cost (used to include also, where required, the fair market value as of March 1, 1913) of both the old and new shares is to be determined in accordance with the following rules:

(1) Where the stock issued as a dividend is all of substantially the same character or preference as the stock upon which the stock dividend is paid, the cost of each share of both the old and new stock will be the quotient of the cost, or fair market value as of March 1, 1913, if acquired prior to that date, of the old shares of stock divided by the total number of the old and new shares.

(2) *Where the stock issued as a dividend is in whole or in part of a character or preference materially different from the stock upon which the stock dividend is paid,* the cost, or fair market value as of March 1, 1913, if acquired prior to that date, of the old shares of stock shall be divided between such old stock and

the new stock, or classes of new stock in proportion, as nearly as may be, to the respective values of each class of stock, old and new, at the time the new shares of stock are issued, and the cost of each share of stock will be the quotient of the cost of the class to which such share belongs divided by the number of shares in that class. [Emphasis supplied.]

\* \* \* \* \* \* \*

The above Treasury decision was incorporated in article 1548 of Regulations 62, under the 1921 Act, and subsequent regulations (articles 1548 and 1599, Regulations 65, 1924 Act; articles 1548 and 1599, Regulations 69, 1926 Act; articles 628 and 600, Regulations 74, 1928 Act) contain substantially similar language.

Commencing with T. D. 3052, promulgated in 1920, *supra*, down to the present time, it has been repeatedly ruled by officers charged with the administration of the several revenue acts that where a corporation transfers a portion of its surplus to capital account and issues and distributes to its stockholders stock representing the amount of the surplus so transferred, such stock is not taxable income to the stockholders. Furthermore, as disclosed by T. D. 3059, *supra*, quoted above and subsequent regulations, the same officers have consistently ruled that a stock dividend " in whole or in part of a character and preference materially different from the stock upon which the stock dividend is paid " is not taxable income to the stockholder receiving the same. O. D. 801, 4 C. B. 24 (January–June 1921), states as follows:

*A stock dividend paid in true preferred stock is exempt from tax the same as though the dividend were paid in common stock;* however, if the stock issued and distributed as a dividend ranks with or prior to the interest of general creditors (with respect to the payment of either interest or principal), it can not be considered true preferred stock, and must be treated as income to the recipient. [Emphasis supplied.]

In I. T. 2538, IX–1 C. B. 144 (1930), the M Co. had outstanding preferred stock, the dividends on which were payable in cash or at the election of the stockholders in common stock. In 1929 a dividend was declared payable in cash on February 15, 1930, to the record holder of each share who had not on or before January 15, 1930, filed a certificate of election to receive dividends in common stock. It was ruled that stockholders who had filed certificates of election on or before the record date received a stock dividend and therefore were not taxable. This is similar to the *Tillotson* case, *supra*, in that preferred stockholders received common stock in payment of their dividends. Furthermore, as illustrative of the consistent practice pursued by administrative officers, the Commissioner, in the *Tillotson* case treated the common stock received by the Tillotson Manufacturing Co., a preferred stockholder, as a nontaxable stock dividend.

In G. C. M. 6709, VIII-2 C. B. 132 (1929), a corporation had issued stock known as "Convertible Class A stock, optional dividend series." The corporate charter provided that dividends on such stock were payable at the option of the stockholder in cash or in class B stock. It was ruled that the class B stock was primarily a stock dividend.

All revenue acts subsequent to the 1921 Act contain substantially similar provisions as those in section 201 (a), (d) of that act hereinbefore quoted. (Section 201 (a), (f), 1924 Act; section 201 (a), (f), (g), 1926 Act; section 115 (a), (f), (g), 1928 Act. The substantial reenactment in later acts of the provisions theretofore construed by administrative officers is persuasive evidence of legislative approval of the administrative interpretation. *Zellerbach Paper Co.* v. *Helvering*, 293 U. S. 172; *Helvering* v. *Bliss*, 293 U. S. 144; *Brewster* v. *Gage*, 280 U. S. 227; *National Lead Co.* v. *United States*, 252 U. S. 140.

In *Alfred A. Laun*, 26 B. T. A. 764; *Pearl B. Brown, Executrix*, 26 B. T. A. 901, affirmed in *Commissioner* v. *Brown*, 69 Fed. (2d) 602; certiorari denied, 293 U. S. 570; *Robert R. Meyer*, 27 B. T. A. 44; *Louis Rorimer*, 27 B. T. A. 871; *T. Pierre Champion*, 27 B. T. A. 1312; *Shelby H. Curlee, Trustee*, 28 B. T. A. 773; and *Frances Elliott Clark*, 28 B. T. A. 1225, the Commissioner treated preferred stock dividends on common stock as nontaxable and his action in this respect was approved by the Board.

In *Alfred A. Laun, supra*, we stated:

In view of the entire record and the intent and purpose of the Company therein disclosed and a consideration of all the relevant facts, *we are of the opinion that the dividend declared in 1923 by the Company was a stock dividend, resulting in a dilution of the shares then outstanding. Eisner* v. *Macomber, supra.* See also *George T. Smith, supra* [21 B. T. A. 782], *George E. Mickel,* 5 B. T. A. 979. [Emphasis supplied.]

In *Pearl B. Brown, Executrix, supra*, we stated:

The ordinary intendment and purpose of the statute [section 201 (g), 1926 Act] is plain enough. A stock dividend being constitutionally free from tax, *Eisner* v. *Macomber*, 252 U. S. 189, and a stock redemption being a *pro tanto* liquidation of investment, the two could easily be used in a common plan so as to circumvent the tax which would be imposed if the distribution were made directly by way of ordinary dividend. * * *

*First.*—Judged by its purpose and operation, and laying aside the directors' designation of a stock dividend in the resolution of December 15, 1922, *the issue of 1922 was, in our opinion, a stock dividend. It was an increase of capitalization and a proportionate distribution among existing shareholders of new certificates reflecting their unchanged interests in the corporation—a mere proliferation of existing interests.* * * * [Emphasis supplied.]

In *Frances Elliott Clark, supra*, we stated:

* * * Accordingly, upon the authority of the *Brown* case, *supra*, we sustain the respondent on this issue and *hold that petitioner received thereby a*

*stock dividend, which neither constitutionally, Eisner v. Macomber, 252 U. S. 189, nor by statute, section 201 (f) of the Revenue Act of 1926, supra, is subject to income tax.* [Emphasis supplied.]

In these cases, as well as the other cases above cited, the Board held that the preferred stock dividends on common stock therein involved were tax-free stock dividends *and in each case what was said in this respect was germane and necessary to the decision.*

The majority opinion states that, when Wile received the preferred stock as a stock dividend, "The corporation then had other preferred stock outstanding." The existence of previous outstanding preferred stock is immaterial. As heretofore pointed out, the holders of preferred stock outstanding prior to the issuance of the stock dividend had no capital interest in the surplus, their interest therein being limited to the prescribed dividend, which they had received and which represented an *income* interest as distinguished from a *capital* interest in the surplus, the assets being sufficient to cover their *capital* interest equivalent to the par value of their shares, since the corporation had a surplus and not a deficit. There is nothing in the Constitution, revenue acts, regulations, rulings, or previous court or Board decisions which intimates that if there is preferred stock outstanding at the time of the issuance of a preferred stock dividend such dividend is not a tax-free stock dividend. This is the first time that such circumstance has been held to be a determining factor in making a stock dividend taxable. There is no authority for such holding and it is wrong in principle. The issuance of the preferred stock dividend had no such effect upon the outstanding preferred stock so as to change the character of the preferred stock dividend from a tax-free to a taxable dividend. Had the corporation, out of surplus, paid cash instead of stock, the assets of the corporation to that extent would have been depleted, but the holders of the preferred stock outstanding could not have rightfully complained. Here the surplus was not distributed in cash or property, but was retained by the corporation, which desired "to keep earnings in the business." In fact, the corporation could have distributed the entire surplus to common stockholders in cash or property and the preferred stockholders would have had no right to complain. The corporation would still have had assets equivalent to the par value of their stock, and, in addition, assets to the value of the amount invested by holders of common stock, which ordinarily is subject to the right of the holders of preferred stocks to a preference as to assets and unpaid dividends upon dissolution. This must all be viewed in the light of the conditions that existed, in this respect, at the time of the declaration and payment of the stock dividend in question, and not in the light of any imaginary anticipated future changed condition. This question here cannot

be rightfully tested by different, assumed conditions as of some other time.

Furthermore, the conclusion is unavoidable that Congress clearly expressed its intention to exempt *all stock dividends from income tax.* Beginning with the 1921 Act Congress, in section 201 (d), provided that a " *stock dividend* shall not be subject to tax." The term " stock dividend " is a broad term. The language used is plain, simple, and direct. It is here used in its ordinary sense and must be so applied. Congress did not limit or restrict it to any particular type of stock or stock of any particular class or to stock where stock of the same class *is not outstanding.*

Congress in section 115 (a) of the applicable 1928 Act defined a taxable dividend as " any *distribution* made by a corporation to its shareholders *whether in money or in other property, out of its earnings or profits* accumulated after February 28, 1913." (Emphasis supplied.) This definition contains two classes of dividends, i. e., (1) dividends " in money " and (2) dividends " in other property ", but both must be " *distributions* * * * *out of its earnings or profits* accumulated after February 28, 1913." This section does not include any other classification of dividends, as did the 1916 and 1918 Acts, the latter including a third classification of dividends " in stock of the corporation." The provision taxing dividends " in stock of the corporation " is the one that was declared unconstitutional in *Eisner* v. *Macomber, supra;* and it was therefore omitted in the 1921 Act and subsequent corresponding acts.

The majority in its findings expressly states that the corporation, " *desiring to keep earnings in the business* ", issued " *dividends on the common stock in preferred stock.*" The findings expressly show that there was no " *distribution* * * * *out of earnings or profits* " of the corporation. On the contrary the corporation retained such " earnings or profits " for its own use in the business. Hence the preferred stock dividend involved in the instant proceeding was not a " distribution * * * out of earnings or profits " as required by section 115 (a), *supra,* defining a taxable dividend, and such dividend, not being within the terms of such definition, must therefore come within section 115 (f) of the same act as a stock dividend which " shall not be subject to tax."

In section 201 (d) and corresponding sections of subsequent acts, Congress deals only with two kinds of stock dividends, i. e., (1) a " true stock dividend made lawfully and in good faith ", *Eisner* v. *Macomber, supra,* and (2) a stock dividend not made lawfully or in good faith, or one made to circumvent taxation. However, Congress did not provide that a stock dividend not made lawfully and in good faith should be subject to tax. It provided that if after the issuance

of a stock dividend the corporation proceeds to cancel or redeem its stock at such time and in such manner as to make the issuance of such stock and the cancellation or redemption thereof essentially equivalent to the payment of a taxable dividend, *the amount received in redemption or cancellation of the stock* shall be treated as a taxable dividend to the extent of the earnings or profits accumulated after February 28, 1913. Even a stock dividend not issued in good faith is not taxable when received. It is the amount subsequently paid by the corporation in cancellation or redemption of a stock dividend not made in good faith that is taxable to the stockholder when received. Hence, when Congress provided that a " stock dividend shall not be subject to tax ", it meant every stock dividend, whether made in good faith or not, or of whatever type or class. It was common knowledge that corporations issued stock of different classes with different rights and privileges, and had Congress intended to limit a " stock dividend " not subject to tax to any particular type or class or otherwise, it obviously would have so provided.

Since it was held in *Eisner* v. *Macomber, supra,* that Congress had no power under the Constitution to tax a dividend in common stock issued to holders of common stock, confining such decision to the stock dividend involved therein, it was not necessary for Congress to legislate to exempt such common stock dividend from tax. Such legislation would be futile. Congress must have had a reason for enacting the provision that a " stock dividend shall not be subject to tax." Cf. *National Bank of the Republic of Chicago,* 31 B. T. A. 680. It must be assumed that Congress had some purpose in so legislating and that a purpose under the circumstances was to remove any question about the taxability of stock dividends other than common stock on common stock. A purpose in so legislating must have been to make it clear that, when a corporation merely transfers profits to capital and issues stock as evidence of the transfer of profits to capital, the stock so issued of whatever type or class shall not be taxable. The purpose so expressed is not contrary to *Eisner* v. *Macomber, supra.* It is in keeping with it.

If it were the intention of Congress that the provision of the Revenue Act of 1921 and subsequent acts that a " stock dividend shall not be subject to tax " should apply only to stock dividends issued in common shares upon common shares and the meaning of the term " stock dividend " should be so limited, then such provision would be unconstitutional because contrary to Article I, section 2, clause 3, and Article I, section 9, clause 4, of the Federal Constitution, requiring that direct taxes shall be apportioned according to population, and also because contrary to the Sixteenth Amendment, since the stock dividend issued in preferred stock to holders of

common stock represents a portion of the *capital* interest of the holders of common stock or a portion of the " enrichment through increase in value of *capital* investment ", which " is not *income* in any proper meaning of the term." (Emphasis supplied.) *Eisner* v. *Macomber, supra.* To the same effect are *Towne* v. *Eisner, supra,* and *Gibbons* v. *Mahon, supra.* It is elementary that if it can be done legislation must be construed so as to bring it within the Constitution rather than in conflict with the Constitution.

Contrary to the holding of the majority opinion, the preferred stock received by Wile was a voluntary tax-free true stock dividend; it was not taxable to him previous to 1928; and the profit, if any, realized by Wile upon the sale of it in 1928 to the corporation should have been computed in accordance with applicable article 628 of Regulations 74, Revenue Act of 1928, which corresponds in this respect to prior regulations under previous acts.